UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

RAYVON RUTHERFORD,

                                    Plaintiff,

            v.

WESTCHESTER COUNTY, ARAMARK
CORRECTIONAL SERVICES, LLC.,
MANUEL MENDOZA, DARNELL FLAX,
PENNY STUART, C.O. BROWN, FRANCIS
DELGROSSO, KARL VOLLMER, DONNA
BLACKMAN, JOSEPH K. SPANO,
SERGEANT HECTOR LOPEZ,

                                    Defendants.

No. 18-CV-4872 (KMK)

OPINION & ORDER

Appearances:

Rayvon Rutherford
Valhalla, NY
*Pro se Plaintiff*

Thomas J. Bracken, Esq.
Bennett, Bricklin & Saltzburg LLC
New York, NY
*Counsel for All Defendants*

Loren Zeitler, Esq.
Westchester County Dep't of Law
White Plains, NY
*Counsel for Defendant Eric Middleton*

KENNETH M. KARAS, United States District Judge:

        Plaintiff Rayvon Rutherford ("Plaintiff"), an inmate at Westchester County Jail ("WCJ")

proceeding pro se, brings this Action, under 42 U.S.C. § 1983, against Defendants Westchester

County; Aramark Correctional Services, LLC ("Aramark"); Joseph K. Spano ("Spano"),

Commissioner of the Westchester County Department of Correction ("WCDOC"); Eric Middleton ("Middleton"), Francis Delgrosso ("Delgrosso"), and Karl Vollmer ("Vollmer"), all Assistant Wardens at WCDOC; Sergeant Hector Lopez ("Lopez") and C.O. Brown ("Brown"), officers of WCDOC and guards at WCJ; and Donna Blackman ("Blackman"), Manuel Mendoza ("Mendoza"), Penny Stuart ("Stuart"), and Darnell Flax ("Flax"), all Aramark employees.[1] (*See* Second Am. Compl. ("SAC") at 1–5 (Dkt. No. 34).)[2] This Opinion refers to Westchester County and Aramark as "Municipal Defendants," the remaining Defendants as "Individual Defendants," and all Defendants collectively as "Defendants."

Plaintiff alleges that Defendants violated his constitutional rights under the First, Eighth and Fourteenth Amendments while he was incarcerated at WCJ. Before the Court is Defendants' Motion To Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Motion"). (*See* Not. of Mot. (Dkt. No. 69).) For the following reasons, the Motion is granted.

## I. Background

### A. Factual Background

The following facts are drawn from Plaintiff's Second Amended Complaint ("SAC") and are taken as true for the purpose of resolving the instant Motion. *See Zuckerman v. Metro. Museum of Art*, 928 F.3d 186, 192 (2d Cir. 2019) (accepting as true all factual allegations contained in the complaint for the purposes of deciding a motion to dismiss).

---

[1] Although Plaintiff's initial Complaint named additional Defendants, including New York Correct Care Solutions Medical Services, P.C. and its medical supervisor, Dr. Raoul Ulloa, these parties were dismissed from the case at Plaintiff's request. (*See* Dkt. No. 42.)

[2] Citations to the SAC reflect the page numbers identified in the ECF stamp. For ease of reading, all quotations from the SAC reflect corrections of minor errors in spelling, punctuation, and capitalization.

Plaintiff arrived at WCJ on January 12, 2018. (SAC at 6.) Since his arrival, Plaintiff has received his meals on moldy trays with "peeling plastic" that "always have leftover food on them." (*Id.*) The meals are "prepared using old foods," and often contain insects, metal and plastic objects, bloody and undercooked meat, and human hair because "the inmate workers who prepare them do not wear gloves, hair-nets or other protective equipment." (*Id.*) The juice containers accompanying the meals are similarly "covered in mold." (*Id.* at 7.) The meals are served during recreational time and, while intended to be hot, are often served cold. (*Id.* at 6–7)

In general, Plaintiff alleges that the meat "on his religious meal trays" arrives "undercooked-pink/raw" five to six days a week, that his "hot meals are always cold," that he is "constantly told to recook the food in the microwave," that his meals "seem[] to . . . always" contain stale, moldy bread, and small portions. (*Id.* at 8–9.) As a result, Plaintiff has become sick. (*Id.* at 9.) Moreover, "whenever" Plaintiff complains to officers that his meals are inedible, officers such as non-party Martinez provide him with a bologna and cheese sandwich, which Plaintiff cannot eat "because it is against [his] religion." (*Id.* at 10.)

Plaintiff describes several specific incidents that give rise to his claims: On May 20, 2018 and June 1, 2018, he received meals containing gray and blonde hairs. (*Id.* at 7.) Plaintiff then attempted to file a grievance with Lopez, but Lopez refused to accept the grievance, explaining, "we don't accept Aramark grievances." (*Id.*) On June 27, 2018, Plaintiff's breakfast contained "ham (pork) inside" despite being labeled "Muslim." (*Id.* at 6–7.) Plaintiff, a Muslim, complained, and he was then given a kosher (rather than a halal) replacement meal. (*Id.*) On May 19, 2018, while Plaintiff was attending a Ramadan service, Brown requested that Plaintiff help with transporting the food-carts to the kitchen. (*Id.* at 10.) Plaintiff "declined because [he] was actively engaged in [his] Ramadan service and breaking [his] fast." (*Id.*) Brown then

"became enraged and irate," and shouted at Plaintiff and other inmates, "see what time you get your food tomorrow; it will be <u>after</u> your fast." (*Id.*) Brown then "retaliated against [Plaintiff] and the Muslim community" by "deliberately and maliciously delaying . . . [their] meals until well after the time [they] were to break [their] fast." (*Id.* at 10-11). Brown then "came to [Plaintiff's] service and called [him] and the others terrorists who should be waterboarded to death." (*Id.*)

On June 28, 2018, Plaintiff found a "water bug carcass in half" in his meal. (*Id.* at 8). Again, Plaintiff attempted to file a grievance with non-party Sergeant Hollis, who refused to accept the grievance, explaining, "you guys already know we don't take Aramark grievances no longer." (*Id.*) Similarly, on July 4, July 16, August 5, and August 9, 2018, Plaintiff discovered dead flies in his "Muslim tray" while eating his meal. Plaintiff attempted to file grievances with Sergeants Martinez and West (both non-parties), but they too refused for similar reasons. (*Id.*)

On September 24, 2018, Plaintiff discovered a "piece of hard plastic" in a slice of cake he was eating. (*Id.* at 9.) Plaintiff reported the incident to an officer, who informed non-party Sergeant Rene; Rene then photographed the plastic object. (*Id.*) The next day, Plaintiff attempted to file a grievance with Lopez concerning the incident, but Lopez refused. (*Id.* at 13.) Lopez "became agitated and very upset" and "began to yell at me and use profanity, stating, 'why the fuck are you giving me that;' 'get away from me,' and 'I'm the wrong one to fuck with.'" (*Id.*) Lopez then instructed Plaintiff to file a grievance with a different sergeant. (*Id.*) When Plaintiff refused to write an additional statement, this "made Sgt. Lopez mad" and led to Lopez calling Plaintiff "vulgar names" before leaving Plaintiff's housing unit. (*Id.* at 13-14.) Lopez returned later that day shortly after noon, and approached Plaintiff's cell "in a threatening manner" while saying, "why are you playing games? You better write the statement, or I'll write

you up for disobeying a direct order." (*Id.* at 14.) Plaintiff alleges that Lopez "continued to use physical and verbal intimidation," threatening Plaintiff's "safety in the jail" and his "good time," and stating, "I'm gonna send you back to the old jail." (*Id.*) Lopez eventually "forced [Plaintiff] to write a statement on the back of [his] original grievance," but then altered the grievance by erasing some of Plaintiff's statements. (*Id.*) Lopez also made additional false statements of his own. (*Id.*)

Plaintiff further alleges that "Defendants Vollmer, Delgrasso and Spano created a policy that states [that] WCDOC does not accept Aramark related grievances." (*Id.* at 11.) These defendants "have been on notice and aware of prison conditions [discussed] herein for an extended duration, but they refuse to intervene." (*Id.*) Moreover, "[s]ometimes, supervising staff make threatening remarks and use verbal and physical intimidation to deter" Plaintiff and other inmates from filing grievances. (*Id.*) Plaintiff also alleges, "on further belief," that "Defendants sued herein" were named in previous suits for similar conduct. (*Id.* at 11-12.) Plaintiff then lists the apparent titles of six suits: "*Perez v. Westchester County*," "*Pagan v. Westchester County*," "*Gomez v. Westchester County*," "*Quick v. Westchester County*," "*Ackridge v. Aramark Correctional Foods*," and "*Alvardo v. Westchester County*." (*Id.* at 12.)

Plaintiff further alleges that Blackman "hires Aramark employees at WCDOC," including Stuart, who "allows inmates to prepare religious meals" unhygienically. (*Id.*) Stuart "witnesses most of conduct herein and allows it to proceed without intervention." (*Id.*) Plaintiff likewise alleges that Flax and Mendoza are "responsible for food preparation, food storage, inmate worker hiring, and the overall supervision of the kitchen," but that "they have delegated their responsibility to line supervisors like Penny Stuart who does not enforce proper written policies." (*Id.*)

Finally, Plaintiff alleges he is "being treated with deliberate indifference" and is "not receiving proper or adequate medical care" from medical staff at the WCJ. (*Id.* at 15.) He has complained for over five months about "substantial," "excruciating," and "chronic" pain in his hands, wrists, and lower arms. (*Id.*) But while medical staff is aware that Plaintiff has "severed tendons in [his] right hand as well as nerve damage," Plaintiff alleges that "all medical staff has done is prescribe [him] Tylenol, and on two occasions, Motrin," rather than addressing the "root cause" of his condition. (*Id.*) Although Plaintiff was referred to the "orthopedic hand specialist" on five occasions and medical supervisor Dr. Raul Ulloa ("Ulloa") is aware of Plaintiff's condition, Ulloa now "refuses and neglects to approve" an additional appointment with the hand specialist. (*Id.* at 15–16.) Indeed, Plaintiff was present when Ulloa told another physician that he would not approve the referral because "they don't take money out of the budget for 'preexisting conditions.'" (*Id.*) This policy is causing Plaintiff "substantial pain and suffering" and "affects [his] daily activities." (*Id.*)

Plaintiff alleges that he has suffered injuries in the form of "stomach pains, stomach cramps, nausea, vomiting, diarrhea, feeling fatigue, headache, weight loss and stretch marks," and violations of his constitutional rights. (*Id*. at 6.) Accordingly, Plaintiff seeks $20,000,000 in compensatory damages and $50,000,000 in punitive damages from all Defendants. (*Id.* at 18.) Plaintiff also seeks a declaratory judgment finding that his constitutional rights were violated. (*Id.*) Plaintiff alleges that he has exhausted all available administrative remedies. (*Id.* at 17-18.)

B.  Procedural Background

Plaintiff filed his initial Complaint and an application to proceed in forma pauperis ("IFP") on May 31, 2018. (Dkt. Nos. 1–2.) The Court granted Plaintiff's IFP application on June 19, 2018. (Dkt. No. 4.) On September 11, 2018 Plaintiff filed his First Amended

Complaint, (Dkt. No. 18,) and on October 26, 2018, he filed his Second Amended Complaint, (Dkt. No. 34). In a letter dated December 13, 2018, Plaintiff requested that the Court dismiss all claims against New York Correct Care Solutions Medical Services, P.C. and Ulloa. (Dkt. No. 41.) On December 19, 2018, the Court granted the request. (Dkt. No. 42.) On May 2, 2019, Defendants filed the instant Motion To Dismiss and accompanying papers. (Not. of Mot.; Mem. of Law in Supp. of Mot. ("Defs.' Mem.") (Dkt. Nos. 69–70).) On June 10, 2019, Plaintiff filed his Response, (Br. in Opp. to Mot. ("Pl.'s Mem.") (Dkt. No. 76),) and on July 8, 2019, Defendants filed their Reply, (Dkt. No. 79).[3]

## II. Discussion

Defendants move to dismiss the Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) on several grounds: that the PLRA prohibits suits based purely on non-physical injury; that Plaintiff's conditions of confinement claims do not rise to the level of a constitutional violation; that the specific allegations of harassment, retaliation and restrictions of religious practice do not amount to a constitutional violation; that Plaintiff failed to plausibly allege personal involvement by Individual Defendants in any constitutional wrongdoings; that Plaintiff failed to state a *Monell* claim against Municipal Defendants; and that several Individual Defendants are shielded by qualified immunity. (*See generally* Defs.' Mem.) The Court concludes that the Eighth Amendment is inapplicable to Plaintiff's circumstances, that Plaintiff's pleadings fail to support a claim under either the Free Exercise Clause or the First Amendment's guarantee of access to courts; and that his Due Process claims fail because Plaintiff does not

---

[3] Subsequent to filing his SAC, Plaintiff submitted several communications to the Court alleging additional instances of retaliation by Brown and Lopez. (See Dkt. Nos. 39, 59, and 60). Defendants have denied these allegations. (Dkt. Nos. 46 and 62.) The Court does not address these events here, however, as they are not discussed in the SAC.

sufficiently plead the personal involvement of Individual Defendants or *Monell* liability with respect to Municipal Defendants. Accordingly, the Court need not, and does not, reach Defendants' remaining arguments.

A.  Standard of Review

While a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations, quotation marks, and alterations omitted). Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (quotation marks and alteration omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff need allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8

marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

In considering a motion to dismiss, the Court "must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Hernandez v. United States*, 939 F.3d 191 (2d Cir. 2019) ("[W]e accept as true all factual allegations . . .") (quotation marks omitted)). Further, "[f]or the purpose of resolving [a] motion to dismiss, the Court . . . draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Where, as here, a plaintiff proceeds pro se, the "complaint[] must be construed liberally and interpreted to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (per curiam) (quotation marks omitted). However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedural and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (quotation marks omitted); *see also Caidor v. Onondaga County*, 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them." (italics and quotation marks omitted)).

B.  Analysis

While Plaintiff does not distinguish between the various Defendants or identify the precise nature of his claims under the First, Eighth and Fourteenth Amendments, the Court interprets the Plaintiff's SAC liberally so as "to raise the strongest arguments that [it] suggest[s]." *Sykes*, 723 F.3d at 403 (citation and quotation marks omitted). The Court discerns

four general species of claims: (1) that Defendants restricted Plaintiff's access to halal food and retaliated against him in violation of the Free Exercise Clause; (2) that Defendants' handling of Plaintiff's grievances violated the First Amendment's guarantee of access to the courts; (3) that deficiencies in Plaintiff's prison food and medical care amounted to unconstitutional conditions of confinement in violation of the Cruel and Unusual Punishments Clause of the Eighth Amendment; and (4) that the same deficiencies violated the Due Process Clause of the Fourteenth Amendment. The Court addresses each potential claim in turn.

### 1. Free Exercise Claims

Defendants argue that Plaintiff has failed to state a claim under the Free Exercise Clause of the First Amendment.

The Free Exercise clause protects religious freedom in several ways. First, this clause prohibits the government from deliberately placing restrictions on religious faith and acts. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993) ("[A] law targeting religious beliefs as such is never permissible[.]" (citations omitted)); *Emp't Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 877 (1990) (explaining that states violate the First Amendment when they seek to ban "acts or abstentions only when they are engaged in for religious reasons, or only because of the religious belief that they display"). Second, the Free Exercise clause prohibits disparate government treatment on the basis of religious status or belief. *See Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1731 (2018) (explaining that state officials are "obliged under the Free Exercise Clause to proceed in a manner neutral toward and tolerant of [Plaintiff's] religious beliefs"); *Smith*, 494 U.S. at 877 (explaining that the Free Exercise clause prohibits states from "impos[ing] special disabilities on

the basis of religious views or religious status" (citations omitted)).[4] Third, in limited circumstances, the Free Exercise clause (perhaps in combination with statutory protections)[5] guarantees reasonable accommodations to sincere religious practitioners. *Redd v. Wright*, 597 F.3d 532, 536 (2d Cir. 2010) ("[T]he right at issue here is [Plaintiff's] right under the First Amendment and RLUIPA to a religious exemption from [a Department of Corrections medical test] Policy.") And fourth, the Free Exercise clause, like the other clauses of the First Amendment, prohibits governments from retaliating against those who exercise their Free Exercise rights. *See Holland v. Goord*, 758 F.3d 215, 225–26 (2d Cir. 2014) (discussing First Amendment retaliation claims generally); *see also Washington v. Chaboty*, No. 09-CV-9199, 2015 WL 1439348, at *9 (S.D.N.Y. Mar. 30, 2015) (recognizing a Free Exercise retaliation claim).

It is well-established that the First Amendment affords inmates constitutional protection to practice their religion. *See O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348 (1987) (holding that "[i]nmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion" (citations omitted)); *Ford v.*

---

[4] These first two species of Free Exercise prohibitions are categorical, automatically drawing (at least) strict constitutional scrutiny. *See Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2024 n.4 (2017) (discussing the statement in *Church of the Lukumi* that "a law targeting religious beliefs as such is never permissible," and concluding that the instant "cannot survive strict scrutiny in any event" (citing 508 U.S. at 533)); *id.* at 2022, 2025 (holding that targeted religious discrimination violates the Free Exercise clause despite the apparent absence of a substantial burden).

[5] While it is well-established that inmates possess a qualified right to religious accommodations, it is unclear whether the First Amendment independently provides such a right, or whether, in the aftermath of *Smith*, this right exists only in combination with the Religious Land Use and Institutionalized Person Act ("RLUIPA"). *See Ford v. McGinnis*, 352 F.3d 582, 594 n.13 (2d Cir. 2003) (discussing *Smith* and prisoners' claims); *Levitan v. Ashcroft*, 281 F.3d 1313, 1318–19 (D.C. Cir. 2002) (same).

*McGinnis,* 352 F.3d 582, 588 (2d Cir. 2003) (explaining that "[p]risoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause" (citation omitted)).  However, because of inmates' unique circumstances, their Free Exercise rights are necessarily somewhat more constrained than those of other persons.  *See Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990) ("Balanced against the constitutional protections afforded prison inmates, including the right to free exercise of religion, are the interests of prison officials charged with complex duties arising from administration of the penal system." (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974))).  Accordingly, "a generally applicable policy will not be held to violate a plaintiff's right to free exercise of religion if that policy is reasonably related to legitimate penological interests."  *Redd*, 597 F.3d at 536 (citation and quotation marks omitted).[6]

---

[6] There appear to be significant differences in how various forms of Free Exercise clause protection are applied to incarcerated persons.  For instance, the prohibitions against deliberate restrictions on religious practices and against religious discrimination appear to apply to inmates just as they do to others.  *See Cooper v. Pate*, 378 U.S. 546, 546 (1964) (per curiam) (holding that a prisoner who alleged that "solely because of his religious beliefs he was denied permission to purchase certain religious publications and denied other privileges enjoyed by other prisoners" stated a claim); *see also Phillips v. Girdich*, 408 F.3d 124, 130 (2d Cir. 2005) (holding, with respect to allegations of disparate treatment of certain inmates on account of their race, "we cannot imagine a legitimate penological reason for the conduct alleged").  By contrast, because "[r]etaliation claims by prisoners are prone to abuse," *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (citation and quotation marks omitted), "prisoners may be required to tolerate more than average citizens, before a retaliatory action taken against them is considered adverse," *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) (citation, alterations, and quotation marks omitted).  Moreover, with respect to "reasonable accommodation" claims, prisoners appear to enjoy greater constitutional protection than non-prisoners; while non-prisoners enjoy no constitutional right to religious accommodations from generally applicable laws, *see Smith*, 494 U.S. at 890, prisoners may demand a religious accommodation where "facilitating exercise of the right . . . . [has] only a de minimis adverse effect on valid penological interests," *Holland*, 758 F.3d at 223 (quoting *Salahuddin v. Goord*, 467 F.3d 263, 274 (2d Cir. 2006)).

In particular, the Second Circuit has held "that prison authorities must accommodate the right of prisoners to receive diets consistent with their religious scruples." *Kahane v. Carlson,* 527 F.2d 492, 495 (2d Cir. 1975) (citations omitted); *see also McEachin v. McGuinnis,* 357 F.3d 197, 203 (2d Cir. 2004) (explaining that to "deny prison inmates the provision of food that satisfies the dictates of their faith . . . unconstitutionally burden[s] their free exercise rights"); *Ford*, 352 F.3d at 597 ("We . . . have clearly established that a prisoner has a right to a diet consistent with his or her religious scruples . . . ." (citation omitted)); *Crichlow v. Fischer*, No. 12-CV-7774, 2015 WL 678725, at *3 (S.D.N.Y. Feb. 17, 2015) ("Generally, an inmate is entitled to a reasonable accommodation of his religious beliefs, including religious dietary beliefs." (citation omitted)).

There is, however, some uncertainty as to the test applied to prisoners' "failure to accommodate" claims. In particular, "[i]t has not been decided in [the Second] Circuit whether, to state a claim under the First Amendment's Free Exercise Clause, a prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Holland*, 758 F.3d at 220 (citations and quotation marks omitted). The Second Circuit and lower courts therein generally assume (without deciding) that a threshold "substantial burden" applies. *See Brandon v. Kinter*, 938 F.3d 21, 32 n.7 (2d Cir. 2019) ("Our Circuit has not yet decided whether the substantial burden requirement remains good law . . . . [W]e likewise assume, without deciding, that [Plaintiff's] free exercise claim is subject to the substantial burden requirement.").[7] However, even when casting doubt on the "substantial burden test," courts

---

[7] Although a "substantial burden" test may apply to claims based on a prison's failure to accommodate inmates' religious practices, there does not appear to be any such requirement for claims of targeted restrictions on religious practice or deliberate religious discrimination. *See e.g.*, *Baskerville v. Mulvaney*, 411 F.3d 45, 49 (2d Cir. 2005) (assuming that even a minor push or shove "might nevertheless be actionable if motivated by racial discrimination or religious

generally have held that a de minimis burden on an inmate's religious practices does not amount to a constitutional violation. *See McEachin*, 357 F.3d at 203 n.6 ("[T]his area of the law is no different from many others in which the time-honored maxim '*de minimis non curat lex*' applies. . . . [T]here are some burdens so minor that they do not amount to a violation . . . ."); *Washington v. Afify*, 968 F. Supp. 2d 532, 537–38 (W.D.N.Y. 2013) (dismissing Free Exercise claims because the "allegations here show at most a de minimis burden on plaintiff's exercise of his religion" (italics omitted)); *see also Rapier v. Harris*, 172 F.3d 999, 1006 n.4 (7th Cir. 1999) ("De minimis burdens on the free exercise of religion are not of constitutional dimension." (collecting cases)).

Liberally construed, Plaintiff's SAC alleges three potential violations of Plaintiff's Free Exercise rights. First, Plaintiff alleges that on May 19, 2018, when he declined Brown's request for help with transporting the food-carts to the kitchen, Brown "retaliated against [Plaintiff] and the Muslim community" by "deliberately and maliciously delaying . . . [their] meals until well after the time [they] were to break [their] fast." (SAC 10–11.) Second, Plaintiff alleges that on June 27, 2018, his purportedly halal breakfast contained "ham (pork) inside," and that even after he complained, he was given a kosher (rather than halal) meal. (*Id.* at 7.) Third, Plaintiff alleges several deficiencies in religious meals he has received (e.g. the presence of human hair, undercooked meat, mold etc.), and that Stuart, Aramark's line supervisor for religious meals, "allows inmates to prepare religious meals" in this deficient manner. (*Id.* at 6, 7, 12.)[8]

---

retaliation"); *see also Trinity Lutheran Church*, 137 S. Ct. at 2022 (holding that deliberately targeted religious discrimination violates the Free Exercise clause despite the apparent absence of a substantial burden); *Church of the Lukumi*, 508 U.S. at 533 ("[A] law targeting religious beliefs as such is never permissible[.]" (citations omitted)).

[8] These three allegations appear to correspond to three different species of Free Exercise claims. The allegation concerning the May 19, 2018 incident suggests a Free Exercise retaliation

None of these potential violations survives Defendants' Motion. With respect to the June 27, 2018 incident, courts in the Second Circuit have generally held that missing a single meal is only a de minimis burden on an inmate's religious practice. *See Torres v. Aramark Food*, No. 14-CV-7498, 2015 WL 9077472, at *9 (S.D.N.Y. Dec. 16, 2015) (defining "a de minimis violation" as "for example, missing one or two meals"); *see also Ford*, 352 F.3d at 594 n.12 (2d Cir. 2003) (distinguishing a failure to accommodate observance of the Eid ul Fitr feast from cases in which "the mere inability to provide a small number of meals commensurate with a prisoner's religious dietary restrictions was found to be a de minimis burden" (citation omitted)). Such de minimis burdens do not generally support a claim under the First Amendment. *See Ward v. Goord,* No. 06-CV-1429, 2009 WL 102928, at *9 (N.D.N.Y. Jan. 13, 2009) (holding that "[t]he failure to provide a single [kosher] meal is insufficient to allege a constitutional violation" (citation omitted)); *Thomas v. Picio*, No. 04-CV-3174, 2008 WL 820740, at *6 (S.D.N.Y. Mar. 26, 2008) (concluding that Plaintiff's allegation of being denied "kosher meals for eight days in February 2001" did not amount to a Free Exercise claim). As Plaintiff alleges only a single incident of ham in his halal meal, and as he acknowledges that Defendants attempted to rectify (or at least ameliorate) the situation immediately, he has not alleged a constitutional violation.

---

claim. *See e.g., Holland*, 758 F.3d at 225–26 (analyzing a Free Exercise retaliation claim). The allegation concerning the June 27, 2018 incident suggests a failure to accommodate claim. *See e.g., Redd*, 597 F.3d at 536 (analyzing a Free Exercise failure to accommodate claim). The allegations concerning deficiencies in the preparation and quality of religious meals may suggest a disparate treatment claim. *See e.g., St. Juste v. Metro Plus Health Plan*, 8 F. Supp. 3d 287, 303 (E.D.N.Y. 2014) (analyzing a "disparate treatment religious discrimination claim" (collecting cases)); *see also Masterpiece Cakeshop,* 138 S. Ct. at 1732 (finding that a state commission violated the Free Exercise clause through "disparate consideration" of the claims of a religious party.)

Similarly, Plaintiff's allegation of generic (albeit frequent) deficiencies in his religious meals cannot sustain a Free Exercise claim for disparate treatment. This is so because Plaintiff does not allege that these deficiencies were particular to halal meals (rather than prison meals more generally) or other facts that might support an inference that these deficiencies were the product of anti-religious hostility or discriminatory treatment. *See Church of the Lukumi*, 508 U.S. at 540 (discussing several means of evaluating religiously discriminatory intent). Indeed, Plaintiff suggests otherwise; in enumerating the deficiencies in WCJ meals, he only occasionally mentions that affected meals were halal, and he explicitly alleges that similar problems affected "the entire WCDOC" population. (SAC 6.) In admitting that halal meals suffer from similar deficiencies as those of the general inmate population, Plaintiff effectively concedes that, with respect to these deficiencies, Defendants have treated him "with the neutrality that the Free Exercise Clause requires." *Masterpiece Cakeshop*, 138 S. Ct. at 1731; *see also Church of the Lukumi*, 508 U.S. at 540 ("In determining if the object of a law is a neutral one under the Free Exercise Clause, we can also find guidance in our equal protection cases."); *Am. Atheists, Inc. v. Port Auth. of NY & NJ*, 936 F. Supp. 2d 321, 339 (S.D.N.Y. 2013) ("[A]bsent allegations of adverse treatment of individuals compared with other similarly situated individuals based on religion, an Equal Protection claim fails." (citation and quotation marks omitted)), *aff'd* 760 F.3d 227 (2d Cir. 2014); *Storm v. Town of Woodstock, N.Y.*, 32 F. Supp. 2d 520, 527 (N.D.N.Y. 1998), *aff'd,* 165 F.3d 15 (2d Cir. 1998) ("[T]he Free Exercise Clause . . . forbids subtle departures from neutrality." (citation and quotation marks omitted)).[9]

---

[9] Insofar as Plaintiff's Free Exercise claims are based on the allegation that "[w]henever I complain to officers that my meals are not consumable, 'sometimes' [officers] like Martinez provide me with a bologna and cheese sandwich . . . which contains pork in it," (SAC 10,) such claims fail as well. Plaintiff does not indicate whether such events are frequent or isolated,

While a closer question, Plaintiff's allegations concerning the May 19, 2018 incident also fail to state a claim under the First Amendment. As alleged, Brown "became enraged and irate" when Plaintiff refused to assist him in the middle of a Ramadan service, threatened to target the Muslim inmate population in retaliation, actually carried out that retaliation by delaying their post-fast meals, and "came to our service and called me and the others terrorists who should be waterboarded to death." (*Id.* at 10–11.) Crucially, Plaintiff does not allege that the delay in meal service directly restricted Muslim inmates' religious practice; rather, he claims that Brown "retaliated against" them for exercising their religious freedom by means of the delay.[10] (*Id.* at 10.) The Second Circuit, however, has held that "[o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) (citation and quotation marks omitted). Brown's verbal expression of anger and his brief delay of a single meal is unlikely to have a deterrent effect on a person of ordinary firmness. *See id.* at 353 ("Insulting or disrespectful comments directed at an inmate generally do not rise to this level." (citation omitted)); *Edwards v. Horn*, No. 10-CV-6194, 2012 WL 760172, at *14 n.13 (S.D.N.Y. Mar. 8, 2012) ("The denial of meals on two occasions, separated by more than three months, is *de minimis* and not actionable."); *Graham v. Knebel*, No. 08-CV-4363,

---

intentional or incidental. Nor does he indicate whether officers eventually provided religiously acceptable meal options. Moreover, Martinez is not named as a Defendant.

[10] Plaintiff does not allege that breaking fast immediately (rather than after a brief delay) was of any religious significance. Accordingly, Plaintiff's allegation concerning the delay must be understood as a retaliation claim rather than as a targeted restriction on religious practice. By contrast, a direct restriction on religious practice, particularly one that is deliberate and motivated by animus, may well be analyzed differently. *See Lukumi*, 508 U.S. at 546 ("A law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny.").

2009 WL 4334382, at *4 (S.D.N.Y. Dec. 1, 2009) (holding that delayed meals and hostile comments are de minimis harms and "do not plausibly state a retaliation claim"); *Snyder v. McGinnis*, No. 03-CV-0902, 2004 WL 1949472, at *11 (W.D.N.Y. Sept. 2, 2004) (finding that denial of food on two occasions was "*de minimis* and not actionable" because "such actions, even if proven at trial, would not chill a person of ordinary firmness from continuing to engage in First Amendment activity" (citations omitted)).  Accordingly, Plaintiff has alleged no viable claims under the Free Exercise Clause.

## 2.  Constitutional Right of Access to Courts Claim

Defendants also argue that Plaintiff's pleading fails to support a claim for the violation of Plaintiff's First Amendment right of access to the courts.

The First Amendment protects a right to access to the courts and to petition the government for the redress of grievances.  *See Bill Johnson's Rests., Inc. v. NLRB,* 461 U.S. 731, 741 (1983) (noting that "the right of access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances.").  However, "[t]o state a claim for denial of access to the courts, 'a plaintiff must allege that the defendant took or was responsible for actions that hindered a plaintiff's efforts to pursue a legal claim.'"  *Crispin v. Westchester County*, No. 18-CV-7561, 2019 WL 2419661, at *4 (S.D.N.Y. June 10, 2019) (quoting *Davis*, 320 F.3d at 351).  Accordingly, courts have generally held that where prison officials "ignore a grievance that raises constitutional claims, the proper avenue to seek relief is . . . directly petitioning the government for redress of his claims."  *Id.* (quoting *Harris v. Westchester Cty. Dep't of Corr.*, No. 06-CV-2011, 2008 WL 953616, at *5 (S.D.N.Y. Apr. 3, 2008)).

Here, Plaintiff alleges that various prison officials refused to accept his Aramark-related grievances, and that Spano, Vollmer and Delgrasso "created a policy that states that WCDOC

does not accept Aramark related grievances." (SAC 11.) Plaintiff further alleges that on September 25, 2018, Lopez not only refused to accept such a grievance, but reacted angrily to Plaintiff's attempt to file one, threatened Plaintiff, eventually forced Plaintiff to write an additional statement on the back of his original grievance, and made unspecified false statements. (*Id.* at 13–14.) Plaintiff's general allegations that Lopez "threatened" him, "used physical and verbal intimidation" and "made false statements on a Westchester Country Memorandum," (SAC 14,) lack the factual detail necessary to state a claim. *See Burroughs v. Petrone*, 138 F. Supp. 3d 182, 210 (N.D.N.Y. 2015) (finding a plaintiff's generic claims that prison guards "threatened" him, "stopped" him from filing a petition, and interfered with his mail were conclusory and failed to state a claim); *see also Friedl v. City of New York*, 210 F.3d 79, 85–86 (2d Cir. 2000) ("claims must be supported by specific and detailed factual allegations, not stated in wholly conclusory terms" (citation and quotation marks omitted)). In any case, it is unclear why a demand that Plaintiff write an additional statement on the back of his original grievance would implicate Plaintiff's right of access to the courts. Finally, "any claim that plaintiff was deprived of his right to petition the government for redress is belied by the fact of his bringing this lawsuit." *Crispin*, 2019 WL 2419661, at *4 (citation omitted); *see also Harris,* 2008 WL 953616, at *5 ("[I]n the event that prison officials ignore a grievance that raises constitutional claims, the proper avenue to seek relief is the course taken by plaintiff here: directly petitioning the government for redress of his claims.").

### 3. Eighth Amendment Claims

Although Plaintiff asserts (and Defendants purport to analyze) claims under the Eighth Amendment, (SAC 6, 18; Defs.' Mem 10–14,) Plaintiff's allegations concerning his conditions of confinement are properly analyzed under the Fourteenth Amendment. "A pretrial detainee's

claims of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eighth Amendment . . . because[] pretrial detainees have not been convicted of a crime and thus may not be punished in any manner—neither cruelly and unusually nor otherwise." *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (citations, alteration, and quotation marks omitted). Here, Plaintiff is a pretrial detainee. (*See* SAC 6.) The Court therefore construes Plaintiff's allegations concerning the adequacy of his meals and medical care as raising claims under the (less restrictive) Due Process Clause and dismisses any putative Eighth Amendment claims.

### 4. Fourteenth Amendment Claims

Defendants advance several arguments why Plaintiff's allegations fail to state a claim for unconstitutional conditions of confinement. The Court agrees with some of those arguments, concluding that Plaintiff has failed to (1) sufficiently plead Individual Defendants' personal involvement in the alleged constitutional deprivations, and (2) state a *Monell* claim against Westchester County and Aramark.

The Supreme Court has explained that a detainee's rights under the Due Process Clause are "at least as great as the Eighth Amendment protections available to a convicted prisoner." *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983) (citation omitted). As with Eighth Amendment claims, however, a pretrial detainee alleging unconstitutional conditions of his confinement "must satisfy two prongs to prove a claim, an 'objective prong' showing that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process, and a 'subjective prong' . . . showing that the officer acted with at least deliberate indifference to the challenged conditions." *Darnell*, 849 F.3d at 29. To satisfy the first, "objective prong," a plaintiff must sufficiently allege "that the conditions, either alone or in

combination, pose an unreasonable risk of serious damage to his health." *Id.* at 30 (citation omitted). In particular, the Second Circuit has held that the Constitution "require[s] that prisoners be served nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well-being of the inmates who consume it." *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983) (citation and quotation marks omitted); *see also Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) (explaining that "the alleged deprivation must be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." (citation and quotation marks omitted)).

To satisfy the "subjective prong," the plaintiff must sufficiently allege that a defendant's mens rea in violating the plaintiff's Due Process rights amounts at least to recklessness. *See Darnell*, 849 F.3d at 32 (citing *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)). In contrast to Eighth Amendment claims, however, the "recklessness" necessary to sustain Fourteenth Amendment claims is comparable to civil law recklessness rather than criminal law recklessness. *Id.* at 35 ("[T]o establish a claim for deliberate indifference to conditions of confinement under the Due Process Clause of the Fourteenth Amendment, the pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety.").

Here, Plaintiff asserts numerous deficiencies in his meals and medical care, and alleges that these deficiencies have resulted in serious health consequences. The Court need not, however, decide whether the specific deprivations Plaintiff identifies reach constitutional

dimensions, because Plaintiff has failed to sufficiently allege Individual Defendants' personal involvement or Municipal Defendants' *Monell* liability for any such claims.

<u>a. Personal Involvement of Individual Defendants</u>

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). To establish personal involvement, a plaintiff must show that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* at 139 (citation, italics, and quotation marks omitted). In other words, "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. Therefore, Plaintiff must plausibly allege that Defendants' actions fall into one of the five categories identified above. *See Lebron v. Mrzyglod*, No. 14-CV-10290, 2017 WL 365493, at *4 (S.D.N.Y. Jan. 24, 2017) (holding that the five categories "still control[] with respect to claims that do not require a showing of discriminatory intent" post-*Iqbal*).

Here, Plaintiff's allegations with respect to Individual Defendants fail to sufficiently allege their personal involvement in the allegedly unconstitutional conduct. For example, Plaintiff fails even to mention Middleton in the body of his SAC. Relatedly, Plaintiff's only allegations regarding Blackman, Flax and Mendoza are that (1) "Blackman hires Aramark employees at WCDOC," and (2) "Flax and Mendoza are responsible for food preparation . . . ,

but they have delegated their responsibility to line supervisors." (SAC 12). Such allegations offer paradigmatic examples of supervisory roles, not direct involvement. They cannot, therefore, sustain claims under § 1983. *See Rivera v. Westchester County*, No. 18-CV-8354, 2019 WL 3958425, at *3 (S.D.N.Y. Aug. 22, 2019) ("Where a defendant is a supervisory official, a mere 'linkage' to the unlawful conduct through the 'chain of command' (i.e., under the doctrine of respondeat superior) is insufficient to show his or her personal involvement in that unlawful conduct." (citation and quotation marks omitted)).

Plaintiff's allegations concerning Stuart are similarly deficient. Plaintiff alleges only that she "allows inmates to prepare religious meals" improperly and unsafely, that she "does not enforce proper written policies," and that "while acting as a line supervisor, she witnesses most of the conduct herein and allows it to proceed without intervention." (SAC 12). Insofar as Plaintiff seeks to attribute to Stuart the conduct of inmates under her supervision simply by virtue of her position, "vicarious liability is inapplicable to . . . § 1983 suits." *Iqbal*, 556 U.S. at 676. Insofar as Plaintiff intends to allege Stuart's personal involvement, Plaintiff's allegations are conclusory and generic: Plaintiff does not tie Stuart to any of the specific incidents in which he received inadequate food and does not describe any specific actions or events in which Stuart was involved. There is, therefore, insufficient factual matter from which the Court could infer Stuart's direct involvement in Plaintiff's alleged constitutional deprivations. *See Vann v. Fischer*, No. 11–CV–1958, 2012 WL 2384428, at *6 (S.D.N.Y. June 21, 2012) (rejecting claims where the plaintiff summarily alleged that the defendant "had knowledge of actions taken" (alteration and quotation marks omitted)); *Lindsey v. Butler*, 43 F. Supp. 3d 317, 329 (S.D.N.Y. 2014) ("Conclusory accusations regarding a defendant's personal involvement in the alleged violation, standing alone, are not sufficient[.]" (citation and quotation marks omitted)).

With respect to Spano, Vollmer and Delgrasso, Plaintiff's only allegations are that (1) they "created a policy that states that WCDOC does not accept Aramark related grievances," and (2) they "have been on notice and aware of prison conditions [discussed] herein for an extended duration, but they refuse to intervene." (SAC 11.) The first allegation fails to state a claim altogether. Insofar as Plaintiff claims that WCDOC's grievance policy violates an independent substantive right, this Court had explained "inmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures [do] not give rise to a cognizable § 1983 claim." *Harris*, 2008 WL 953616, at *5 (citation and quotation marks omitted). Insofar as Plaintiff claims that the policy violates his constitutional right of access to the courts, the Court has already rejected any such claim for the reasons stated above. Nor does such a grievance policy suggest that Defendants were "deliberately indifferent" to serving constitutionally inadequate food at WCJ. On the contrary, Defendants' policy may well reflect their belief that WCJ food was adequate and that inmate complaints were therefore frivolous.

The second allegation against Spano, Vollmer and Delgrasso is similarly deficient. Plaintiff simply claims that that these Defendants "have been on notice and aware of prison conditions [discussed] herein for an extended duration, but they refuse to intervene." (SAC 11). These allegations are "conclusory" and therefore do not suffice. *Rivera*, 2019 WL 3958425, at *3 (holding than an allegation that Defendants "had sufficient prior knowledge that the food being served to inmates at WCDOC was substandard" was "conclusory . . . [and] insufficient"). While Plaintiff also alleges, "on further belief," that "Defendants sued herein" were sued in previous suits for similar conduct and have answered "over 100 food-related grievances," (SAC 11–12,) Plaintiff does not specifically allege that Individual Defendants were named in the

lawsuits to which Plaintiff refers, nor does Plaintiff describe the specific conduct that was at issue in those suits or complaints.[11]  This allegation cannot, therefore, establish Individual Defendant's personal involvement through deliberate indifference.  *See Rivera*, 2019 WL 3958425, at *5 ("Although Plaintiff alleges that numerous similar lawsuits, grievances, and complaints against Aramark have been filed, he fails to provide any factual details regarding these other lawsuits and grievances.  The absence of such detail dooms Plaintiff's Complaint.") (collecting cases)).

Because Plaintiff does not plead sufficient facts to establish any Individual Defendant's personal involvement in his alleged Due Process deprivations, all such claims against Individual Defendants must be dismissed.

### b.  *Monell* Liability

"Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort."  *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978); *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986) (holding that a municipality may not be liable under § 1983 "by application of the doctrine of respondeat superior" (italics omitted)).  Accordingly, "municipalities may only be held liable when the municipality itself deprives an individual of a

---

[11] Plaintiff lists the titles of six prior lawsuits, but omits docket numbers, dates, or other identifying information: "*Perez v. Westchester County, Pagan v. Westchester County, Gomez v. Westchester County, Quick v. Westchester County, Ackridge v. Aramark Correctional Food Services,* [and] *Alvardo v. Westchester County.*"  (*Id.* at 12.)  Multiple prisoner suits bearing these titles do not, in fact, name Spano, Vollmer or Delgrasso as defendants at all.  *See e.g.*, *Perez v. Westchester Cty. Dep't of Corr.*, 587 F.3d 143 (2d Cir. 2009); *Ackridge v. Aramark Corr. Food Servs.*, No. 16-CV-6301, 2018 WL 1626175 (S.D.N.Y. Mar. 30, 2018); *Gomez v. Westchester County*, No. 12-CV-6869, 2015 WL 1054902 (S.D.N.Y. Mar. 10, 2015); *Gomez v. Westchester County*, No. 13-CV-7015, 2014 WL 8841310 (S.D.N.Y. May 14, 2014); *Pagan v. Westchester County*, No. 12-CV-7669, 2014 WL 982876 (S.D.N.Y. Mar. 12, 2014).

constitutional right." *Newton v. City of New York*, 566 F. Supp. 2d 256, 270 (S.D.N.Y. 2008). Therefore, "to prevail on a claim against a municipality under [§] 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008) (citation omitted). The fifth element reflects the notion that a *Monell* defendant "may not be held liable under § 1983 solely because it employs a tortfeasor." *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997). A plaintiff may satisfy the fifth element by alleging one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (citations omitted).

Liberally construed, Plaintiff seeks to establish *Monell* liability based on the third and fourth prongs enumerated in *Brandon*. Indeed, Plaintiff's SAC includes several sentences that purport to allege widespread practices and supervisory failures. For example, Plaintiff alleges that his claims "stem from my meal trays arriving to me and the entire WCDOC as follows . . .," (SAC 6 (emphasis added)); that senior officials "have been on notice and aware of prison conditions herein for an extended duration, but they refuse to intervene as supervisory defendants," (*id.* at 11); that "Defendants sued herein are named in . . . actions for similar conduct[] and prior to their [policy of refusing to accept Aramark-related grievances] they answered over 100 food-related grievances," (*id.* at 11–12); and that senior officials responsible

for food preparation, storage and kitchen supervision have "delegated their responsibility to line supervisors . . . who do[] not enforce proper written policies," (*id.* at 12).

These allegations cannot sustain a *Monell* claim under either of the above-identified prongs. First, Plaintiff cannot sustain a claim based on a consistent and widespread practice because his allegation concerning the meals of "the entire WCDOC" is patently generic and conclusory. An inmate cannot state a "consistent and widespread practice" simply by alleging his own experiences and then extrapolating to the entire jail population. *See Aragon v. New York*, No. 14-CV-9797, 2017 WL 2703562, at *6 (S.D.N.Y. June 22, 2017) (dismissing claims where "Plaintiff seems to allege the existence of a practice adopted by the [County] solely based on Plaintiff's alleged experience"). Plaintiff's claims that Defendants were previously sued for similar conduct is similarly general; Plaintiff does not describe the conduct alleged in these suits in any detail, nor explain whether and how the conduct alleged in those suits was widespread and consistent. "The absence of such detail dooms Plaintiff's Complaint." *Rivera*, 2019 WL 3958425 at *5 (collecting cases); *see also Mercedes v. Westchester County*, No. 18-CV-4087, 2019 WL 1429566, at *5 (S.D.N.Y. Mar. 29, 2019) (dismissing *Monell* claim against Aramark and county alleging that the plaintiff was served unhygienic and inedible food where the plaintiff did not allege "the existence of any policy, any actions taken or decisions made by . . . policymaking officials, any systemic failures to train or supervise," or any "factual indicia from which this Court could infer the existence of a policy or custom"); *Hoffstead v. Aramark Corr. Servs., LLC*, No. 18-CV-2381, 2019 WL 1331634, at *4–5 (S.D.N.Y. Mar. 25, 2019) (same); *McKenzie v. City of Mount Vernon*, No. 18-CV-603, 2018 WL 6831157, at *7 (S.D.N.Y. Dec. 28, 2018) (dismissing *Monell* claim where the plaintiff did "not allege any facts suggesting a policy or custom that led to [the] alleged" constitutional deprivation); *Ackridge v. Aramark*

*Corr. Food Servs.*, No. 16-CV-6301, 2018 WL 1626175, at *13 (S.D.N.Y. Mar. 30, 2018)

(dismissing *Monell* claim against county alleging the plaintiff was not served kosher food

because the plaintiff failed to allege any specific facts about a custom or policy aside from the

facts of his own case); *Gordon v. City of New York*, No. 10-CV-5148, 2012 WL 1068023, at *4

(E.D.N.Y. Mar. 29, 2012) (dismissing *Monell* claim where the plaintiff's "allegation [was]

unsupported by anything other than the facts of what occurred in his particular case" (citations

omitted)).

Similarly, Plaintiff cannot sustain a claim based on failure to train. Although "[a]

municipality's failure to properly train its employees can under certain circumstances give rise to

*Monell* liability, . . . a claim based on this theory still must be properly pled under *Iqbal*." *Simms

v. City of New York*, No. 10-CV-3420, 2011 WL 4543051, at *2 (E.D.N.Y. Sept. 28, 2011)

(citation and footnote omitted), *aff'd*, 480 F. App'x 627 (2d Cir. 2012). To state a claim for

municipal liability based on a failure to train, Plaintiff must allege facts that support an inference

that Municipal Defendants failed to train their employees, that they did so with deliberate

indifference, and that the failure to train caused his constitutional injuries. *See Treadwell v.

County of Putnam*, No. 14-CV-10137, 2016 WL 1268279, at *4 (S.D.N.Y. Mar. 30, 2016) ("To

establish *Monell* liability premised on a failure to supervise, a plaintiff must plead that (1) there

was a pattern of allegations of or complaints about, or a pattern of actual, similar unconstitutional

activity, and (2) the municipality consistently failed to investigate those allegations." (citation

omitted)). In particular, "a plaintiff must plausibly allege a specific deficiency in the

municipality's training." *Tieman v. City of Newburgh*, No. 13-CV-4178, 2015 WL 1379652, at

*22 (S.D.N.Y. Mar. 26, 2015). Furthermore, a failure to train constitutes a policy or custom that

is actionable under § 1983 only where "in light of the duties assigned to specific officers or

employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989) (footnote omitted).

Here, Plaintiff has alleged no specific facts suggesting deficiencies in Westchester County's and Aramark's training or supervision protocols claims. Rather, Plaintiff's bare statements that Westchester County failed to supervise inmates or "enforce proper written policies," (SAC 12) are simply "boilerplate assertions" and are therefore insufficient, without more, to state a *Monell* claim. *Araujo v. City of New York*, No. 08-CV-3715, 2010 WL 1049583, at *9 (E.D.N.Y. Mar. 19, 2010) (dismissing failure to train claim where a plaintiff alleged "no facts to indicate any deliberate choice by municipal policymakers to engage in unconstitutional conduct"); *see also Quick v. Westchester County*, No. 18-CV-243, 2019 WL 1083784, at *5 (S.D.N.Y. Mar. 7, 2019) (dismissing *Monell* claim where the plaintiff alleged failure to supervise kitchen workers who did not wear hair nets, among other shortcomings, because the complaint was "devoid of any detailed factual allegations" that WCDOC lacked "a relevant training or supervisory program" or that WCDOC "was otherwise deliberately indifferent to food preparation problems"); *Triano v. Town of Harrison, N.Y.*, 895 F. Supp. 2d 526, 539–40 (S.D.N.Y. 2012) (dismissing *Monell* claim where the plaintiff "merely alleged that the [t]own failed to train its employees, without providing any supporting factual detail about alleged deficiencies in the training program").

Under some circumstances, a plaintiff may also establish a municipal defendant's deliberately indifferent failure to supervise by showing "that the need for more or better supervision to protect against constitutional violations was obvious" from the fact that there

"were repeated complaints of civil rights violations," and that "the complaints [were] followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Shepherd v. Powers*, No. 11-CV-6860, 2012 WL 4477241, at *9 (S.D.N.Y. Sept. 27, 2012) (citation and quotation marks omitted); *see also Lawrence v. City of Rochester*, No. 09-CV-6078, 2015 WL 510048, at *7 (W.D.N.Y. Feb. 6, 2015) ("Deliberate indifference may be inferred from the failure to train or supervise based on proof of repeated complaints of civil rights violations that are followed by no meaningful attempt on the part of the municipality to investigate or to forestall." (citation and quotation marks omitted)); *Aretakis v. Durivage*, No. 07-CV-1273, 2009 WL 249781, at *29 (N.D.N.Y. Feb. 3, 2009) (same).

Plaintiff cannot, however, sustain such a claim here. Plaintiff's allegation that "Defendants sued herein are named in . . . actions for similar conduct[]" and that "prior to their [policy of refusing Aramark-related grievances] they answered over 100 food-related grievances," (SAC 11–12) bears little resemblance to those precedents where plaintiffs successfully established deliberate indifference by pointing to previous grievances and lawsuits. Crucially, in those precedents, Plaintiff identified prior suits with specificity and pled details of the previous suits. *See Tieman*, 2015 WL 1379652, at *19–21 (holding that the plaintiff sufficiently alleged the need for better training or supervision where the plaintiff listed and detailed nine other complaints raising similar allegations against same defendants); *McCants v. City of Newburgh*, No. 14-CV-556, 2014 WL 6645987, at *4–5 (S.D.N.Y. Nov. 21, 2014) (holding that plaintiff sufficiently alleged a need for better training or supervision where plaintiff listed and detailed seventeen other complaints over a seven-year period raising similar allegations against the same defendants); *Farrow v. City of Syracuse*, No. 12-CV-1401, 2014 WL 1311903, at *8 n.7 (N.D.N.Y. Mar. 31, 2014) (stating that the fact that "at least 15 excessive

force complaints ha[d] been filed against the [c]ity in the past 5 years" would be sufficient to state a plausible failure to train case). Here, Plaintiff's allegation of prior suits and complaints is comparatively sparse; although Plaintiff provides the (partial) title of six purportedly related cases, (SAC 12,) he offers no details about the nature of the complaints, the extent of the violations they purport to identify, or their similarity to the violations alleged here. Moreover, the Court cannot, with any degree of confidence, identify precisely to which prior cases Plaintiff intends to refer. Similarly, Plaintiff has provided no information about the nature, extent, or content of these previous food-related grievances. Such bare allegations are insufficient to support a claim of deliberate indifference. *See Smith v. Westchester County*, No. 19-CV-1283, 2019 WL 5816120, at *6 (S.D.N.Y. Nov. 7, 2019) (explaining that because the plaintiff "provided no information about the nature, extent, or content of past [alleged] grievances," these allegations were "generic" and "insufficient to support a claim of deliberate indifference."); *Cruz v. City of New York*, No. 15-CV-2265, 2016 WL 234853, at *4 (S.D.N.Y. Jan. 19, 2016) (rejecting a claim of municipal practice predicated on the existence of prior suits where "the Complaint provides no information about the cases it cites, no description of evidence adduced in those cases, and no explanation of how the cases, individually or taken together, demonstrate a consistent and widespread practice sufficient to constitute an unlawful policy or custom").

Because Plaintiff's allegations do not support claims under *Monell*, all claims against Westchester County and Aramark must be dismissed.

### III. Conclusion

For the reasons stated above, Defendants' Motion To Dismiss is granted. Because this is the first adjudication of Plaintiff's claims, the dismissal is without prejudice. If Plaintiff wishes to file a third amended complaint, Plaintiff must do so within 30 days of the date of this Opinion.

Plaintiff should include within that amended complaint all changes to correct the deficiencies identified in this Opinion that Plaintiff wishes the Court to consider. Plaintiff is advised that the third amended complaint will replace, not supplement, the SAC. The amended complaint must contain *all* of the claims, factual allegations, and exhibits that Plaintiff wishes the Court to consider. If Plaintiff fails to abide by the 30-day deadline, his claims may be dismissed with prejudice.

The Clerk is respectfully directed to terminate the pending Motion, (*see* Dkt. No. 69), and mail a copy of this Order to Plaintiff.

SO ORDERED.

Dated: January 28, 2020
White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE